**FIELDWORK BOSTON, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV.A. 02–11824–RBC.[1]**

United States District Court, D. Massachusetts.

Oct. 14, 2004.

Memorandum and Order Denying Motion to Amend Judgment November 4, 2004.

---

1. With the parties' consent, this case has been referred and reassigned to the undersigned for all purposes including trial and the entry of judgment pursuant to 28 U.S.C. § 636(c).

Philip M. Howe, Matthew W. Perkins, Lecomte, Emanuelson & Doyle, Quincy, MA, for Fieldwork Boston, In, Plaintiff.

Michael P. Sady, United States Attorney's Office, Boston, MA, for United States of America, Defendant.

### *MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT (# 23)*

COLLINGS, United States Magistrate Judge.

## I. INTRODUCTION

On September 17, 2002, plaintiff Fieldwork Boston, Inc. ("Fieldwork") filed a one-count complaint (# 1) against defendant United States of America ("United States" or "government"). The single claim was one for common law tort-based indemnity under the Federal Tort Claims Act ("FTCA") arising from the plaintiff having settled a prior civil action for an alleged violation of the Massachusetts Wiretap Act, Mass. Gen. L. c. 272, § 99Q on June 14, 1995. Fieldwork seeks damages from the government for the costs it incurred in defending and settling the prior lawsuit, plus applicable statutory interest as well as the costs and attorneys' fees incurred in this action. In lieu of answering the complaint, on January 31, 2003 the United States filed a motion to dismiss. (# 5) Two weeks later on February 14, 2003, the plaintiff filed an opposition to the dispositive motion (# 7) and on March 31, 2003, the government filed a reply. (# 10)

In response to an argument advanced by the government, on July 24, 2003, the District Judge to whom the case was then assigned ordered Fieldwork to brief the issue of subject matter jurisdiction. (# 11) Thereafter the plaintiff timely submitted its supplemental memorandum addressing the jurisdictional question. (# 12) On August 28, 2003, the Court determined that Fieldwork's vicarious liability argument failed to state a claim upon which relief may be granted, but further found that the plaintiff's second theory of indemnification based upon comparative-fault was viable. The Court denied the government's motion to dismiss (# 13), but never addressed the issue of subject matter jurisdiction.

On September 22, 2003, plaintiff Fieldwork filed its first amended complaint (# 16) which contains a claim in a single count for "common law tort based indemnification." Approximately two months later, the United States filed a Rule 12(b)(1) motion to dismiss the first amended complaint for lack of subject matter jurisdiction. (# 23) On December 4, 2003, Fieldwork filed its memorandum in opposition to defendant's motion to dismiss.

Following a hearing on the dispositive motion, the plaintiff was ordered to file and serve a supplemental brief on or before the close of business on June, 4, 2004, and the defendant was granted leave to file a reply brief on or before the close of business on June 11, 2004. With these further filings, the record is now complete, the motion to dismiss the first amended complaint is in a position to be resolved.

## II. THE FACTS

Fieldwork is a Massachusetts corporation that provides focus group facilities, including facilities for audio- and videotaping the focus group discussions. (# 16, ¶ 8) The Department of Veteran Affairs is a cabinet department of the United States,

the named defendant in this case. (# 16, ¶ 2)

According to the amended complaint, in 1995 the Veterans Administration ("VA") sponsored a research project entitled "The Perceptions and Experiences of Women Veterans in Accessing Health Care." (# 16, ¶ 6) The project was designed to survey female veterans on their perceptions and experiences in regard to health care they received at the VA. (# 16, ¶ 6) In implementing this project, the VA employed a research team comprised of three female physicians and a female research assistant. (# 16, ¶ 7) The VA's research team made arrangements to use Fieldwork's facility in Waltham, Massachusetts to conduct their focus groups. (# 16, ¶ 8) In the parties' May 10, 1995 contract, Fieldwork agreed to provide the VA with a focus group room, an adjacent observation room, refreshments, and audio- and video-taping facilities. (# 16, ¶ 8)

On June 20, 1995, Dr. Amy Stern of the VA's research team contacted Fieldwork's receptionist to confirm that the focus group session would be audio- and video-taped. (# 16, ¶ 13) Pursuant to her instructions, the focus group session in fact was both audio- and video-taped. (# 16, ¶ 13) Despite its customary practice of advising focus group participants using their facilities that they would be audio- and video-taped, in order to comply with the request of the VA's research group, Fieldwork did not advise the VA focus group participants that their discussions would be recorded. (# 16, ¶ 15) Similarly, although Fieldwork routinely used sign-in sheets which notified participants that a focus group might be audio-taped and/or video-taped, it agreed to forego use of its own sign-in sheets on the evening of June 20, 1995. (# 16, ¶¶ 10, 12) Instead, pursuant to Dr. Stern's instructions, it used a different sign-in sheet created by another member of the research team which did not contain such a notification, but only asked the participants to provide their names and social security numbers for payment purposes. (# 16, ¶ 11) It is alleged that Fieldwork abdicated its customary procedures in reliance on an oral agreement with Drs. Wolfe, Stern and Daley that the doctors would ". . . orally notify the focus group participants that they were being taped." (# 16, ¶ 12)

The focus group conducted on June 20, 1995 consisted of seven or eight women. (# 16, ¶ 14) In order to assist her with leading the discussion, Dr. Jennifer Daley of the VA's research team had been provided beforehand with a written script. (# 16, ¶ 16) Although one of the sentences in the introduction of the script notified the group's members that their discussions would be audio-recorded and video-taped, Dr. Daley omitted that sentence during her presentation. (# 16, ¶ 16) Moreover, throughout the course of the session, she never advised the participants of the taping and apparently did not realize this until the session had concluded. (# 16, ¶ 16) Consequently, the focus group participants were audio- and video-taped without their prior authorization. (# 16, ¶ 18) Dr. Wolfe later informed the participants that a mistake had occurred when Dr. Daley failed to inform them that the session would be recorded. (# 16, ¶ 17)

Three of the participants thereafter filed suit against Fieldwork in the Middlesex Superior Court. (# 16, ¶ 20) In their complaint, they alleged a civil violation of the Massachusetts Wiretap Act, Mass. Gen. L. c. 272, § 99Q, invasion of privacy, and negligent infliction of emotional distress. (# 16, ¶ 20) On October 31, 2000, Fieldwork requested that the VA defend and indemnify it for its attorneys' fees as well as settlement costs. (# 16, ¶ 21) On December 7, 2000, Fieldwork settled with the

participants agreeing to pay an aggregate sum of $165,000, with each participant receiving $55,000. (# 16, ¶ 22)

Consequent to this settlement, in 2001 Fieldwork filed suit in the United States Court of Federal Claims seeking indemnification from the United States. Fieldwork set forth three claims, namely, breach of express contract, breach of implied contract and indemnification. The United States filed a motion to dismiss arguing, *inter alia,* that the Court of Federal Claims lacked jurisdiction pursuant to the Tucker Act given that Fieldwork's claims were not contract claims, but rather "sounded in tort."

Honorable Loren A. Smith, Senior Judge of the Court of Federal Claims, heard oral arguments on the motion to dismiss on December 10, 2001.(# 31) Judge Smith ruled from the bench dismissing Fieldwork's suit on the grounds that no viable contract claims had been pled. (# 31) He added that the Court of Federal Claims had no jurisdiction over Fieldwork's possible tort claims, which could properly be filed in the United States District Court pursuant to the FTCA.

On September 17, 2002, Fieldwork filed the instant suit seeking tort-based indemnification. (# 16)

### III. THE STANDARD

Pursuant to Rule 12(b)(1), Fed.R.Civ.P., a defendant may move to dismiss an action based on lack of federal subject matter jurisdiction. Because federal courts are considered courts of limited jurisdiction, "federal jurisdiction is never presumed." *Viqueira v. First Bank,* 140 F.3d 12, 16 (1 Cir., 1998). Instead, " 'the party invoking the jurisdiction of a federal court carries the burden of proving its existence.' " *Murphy v. United States,* 45 F.3d 520, 522 (1 Cir.), *cert. denied,* 515 U.S. 1144, 115 S.Ct. 2581, 132 L.Ed.2d 831 (1995) (quot-

ing *Taber Partners, I v. Merit Builders, Inc.,* 987 F.2d 57, 60 (1 Cir.), *cert. denied,* 510 U.S. 823, 114 S.Ct. 82, 126 L.Ed.2d 50 (1993)).

Once a defendant challenges the jurisdictional basis for a claim under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction. *Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942); *Aversa v. United States,* 99 F.3d 1200, 1209 (1 Cir., 1996); *Murphy,* 45 F.3d at 522. The First Circuit has held that the proponent must clearly indicate the grounds upon which the Court may properly exercise jurisdiction over the matter presented: "[I]t is black-letter law that jurisdiction must be apparent from the face of the plaintiffs' pleading." *PCS 2000 LP v. Romulus Telecommunications, Inc.,* 148 F.3d 32, 35 (1 Cir., 1998) (quoting *Viqueira,* 140 F.3d at 18). Hence, if the plaintiff fails to show a basis for either diversity or federal question jurisdiction, the district court must grant the defendant's Rule 12(b)(1) motion.

In ruling on a motion to dismiss for lack of jurisdiction, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of plaintiff." *Aversa,* 99 F.3d at 1210; *Murphy,* 45 F.3d at 522. That is not to say that this leniency eliminates the plaintiff's burden of proving an appropriate jurisdictional basis. Indeed, a plaintiff cannot assert a proper jurisdictional basis "merely on 'unsupported conclusions or interpretations of law.' " *Murphy,* 45 F.3d at 522 (quoting *Washington Legal Foundation v. Massachusetts Bar Foundation,* 993 F.2d 962, 971 (1 Cir., 1993)). Accordingly, a motion to dismiss should be granted where, even after assuming all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiff, "it is clear that no relief

could be granted under any set of facts that could be proved consistent with the allegations." *Doran v. Massachusetts Turnpike Authority*, 348 F.3d 315, 318 (1 Cir., 2003), *cert. denied*, ⸺ U.S. ⸺, 124 S.Ct. 2107, 158 L.Ed.2d 712 (2004) (quoting *Gorski v. New Hampshire Dep't of Corrections*, 290 F.3d 466, 473 (1 Cir., 2002)(citing *Hishon v. King and Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984))).

## IV. DISCUSSION

### A. Is It A Tort?

As noted in the May 10th Procedural Order (# 28), the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, provides, as the name implies, that the United States shall be liable for tort claims in certain circumstances. The Court had a substantial question as to whether the first amended complaint set forth any tort claim against the United States. As the facts are pleaded, there is nothing to indicate that, at the time the representation was made that the government would notify participants of the taping, the representation was false. Rather, what is alleged is that after the representation was made, the government failed to comply with what it said it had intended to do. Isn't this a failure of the government to do what it said it would do rather than the government failing to do what it said it intended at a time when it, in fact, never intended to do what it represented? And if this is so, what is the *tort* for which the plaintiff seeks to hold the government liable?

Consider this. Under the *Restatement (Second) of Torts*, § 530(1):

A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.

And the Comment provides:

If the statement is honestly made and the intention in fact exists, one who acts

in justifiable reliance upon it cannot maintain an action of deceit if the maker for any reason changes his mind and fails or refuses to carry out his expressed intention into effect. **If the recipient wishes to have legal assurance that the intention honestly entertained will be carried out, he must see to it that it is expressed in an enforceable contract, and his action must be on the contract.** (Emphasis supplied).

Responding to the Court's query, the plaintiff insists that it has pled a tort claim, citing several cases in support of its position. In the primary case upon which Fieldwork relies, *Mullins v. Pine Manor College,* the plaintiff, a student, sued the college she attended after she was raped on campus. *Pine Manor,* 389 Mass. 47, 47, 449 N.E.2d 331, 333 (1983). Although the college contended that it owed "no duty to protect students against the criminal acts of third parties", the Massachusetts Supreme Judicial Court concluded that just such a duty could be "grounded on either of two well established principles of law." *Pine Manor,* 389 Mass. at 50-1, 449 N.E.2d at 334-5. It is the second ground to which Fieldwork points:

It is an established principle that a duty voluntarily assumed must be performed with due care. *Black v. New York, N.H., & H.R.R.,* 193 Mass. 448, 79 N.E. 797 (1907). *See Phillips v. Chicago Hous. Auth.,* 89 Ill.2d 122, 123, 59 Ill. Dec. 281, 431 N.E.2d 1038 (1982); *Cross v. Wells Fargo Alarm Servs.,* 82 Ill.2d 313, 45 Ill.Dec. 121, 412 N.E.2d 472 (1980); *Pippin v. Chicago Hous. Auth.,* 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596 (1979). *Restatement (Second) of Torts* § 323 (1965), states: "One who undertakes, gratuitously or for consideration, to render services to another

which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."

*Pine Manor*, 389 Mass. at 52–3, 449 N.E.2d at 336 (footnote omitted).

The SJC reiterated this principle in a case where a pharmacy asserted that it owed no duty to its customers to warn them about possible side effects of prescribed drugs. *Cottam v. CVS Pharmacy*, 436 Mass. 316, 317, 764 N.E.2d 814, 817 (2002). In denouncing that argument, the Court wrote:

A pharmacy, like any other person or entity, may voluntarily assume a duty that would not otherwise be imposed on it, and thus may voluntarily assume a duty to provide information, advice or warnings to its customers. Massachusetts recognizes that "a duty voluntarily assumed must be performed with due care," and we have approved the principles pertaining to voluntary assumption of a duty as set forth in the *Restatement (Second) of Torts* § 323 (1965). *Mullins v. Pine Manor College*, 389 Mass. 47, 52,

53, 449 N.E.2d 331 (1983). "If a person voluntarily assumes a duty or undertakes to render services to another that should have been seen as necessary for her protection, that person may be liable for harm caused because of the negligent performance of his undertaking." *Thorson v. Mandell*, 402 Mass. 744, 748, 525 N.E.2d 375 (1988)[2].

*Cottam*, 436 Mass. at 323–4, 764 N.E.2d at 821–2 (footnote omitted).

In yet a third case, *Pierre v. United States*, the plaintiff sued the government on behalf of her minor child for personal injuries resulting from the Department of Housing and Urban Development's ("HUD") alleged negligence in performing a voluntary undertaking of painting a home she had purchased. *Pierre*, 741 F.Supp. 306, 307 (D.Mass., 1990). The house was repainted several times but kept peeling. *Pierre*, 741 F.Supp. at 308. Although HUD was aware that given its age the house had lead paint, no one from HUD inspected the premises for lead paint. *Pierre*, 741 F.Supp. at 308. The plaintiff's daughter ingested paint chips and consequently suffered from lead poisoning. *Pierre*, 741 F.Supp. at 308. Relying on the *Mullins* decision, the Court found HUD negligent in its voluntary undertaking and thus liable for the resulting harm.[3] *Pierre*, 741 F.Supp. at 309–10.

**2.** In the *Thorson* case, while rehearsing for a play on the defendant's premises, the plaintiff was gravely injured when she fell while attempting to perform a backflip. Reviewing potential grounds upon which to premise liability, the Supreme Judicial Court wrote:

Thorson's first theory is based on an asserted applicability of the "good Samaritan" principles expressed in *Restatement (Second) of Torts* § 323 (1965), and recognized in *Mullins v. Pine Manor College*, 389 Mass. 47, 52–53, 449 N.E.2d 331 (1983), and earlier cases. If a person voluntarily assumes a duty or undertakes to render services to another that should have been seen as nec-

essary for her protection, that person may be liable for harm caused because of the negligent performance of his undertaking. The YWCA did not assume any duty to Thorson nor did it undertake to render any services to her which the YWCA should have recognized as necessary for her protection.

*Thorson*, 402 Mass. at 748, 525 N.E.2d at 378 (footnote omitted).

**3.** HUD was also liable "on account of [its] violation of its duty to obey its own regulations when it repainted the premises." *Pierre*, 741 F.Supp. at 309.

Although Fieldwork relies on these decisions for the proposition that "tort liability lies against the Government because the government voluntarily assumed the duty to notify the focus group participants of the taping of the proceedings," (# 30 at 7), it is clear that the good Samaritan rule incorporated in the *Restatement (Second) of Torts* § 323 is inapplicable to the facts at hand. The reason for this is simple: section 323 mandates that an actor "is subject to liability to the other *for physical harm* resulting from his failure to exercise reasonable care to perform his undertaking." There is no physical injury at issue in the case at bar.

Fieldwork also cites a second tier of cases, but again, the facts of each are readily distinguishable. For example, in *LaClair v. Silberline Manufacturing Co., Inc.*, the administratrix of a decedent employee sued, *inter alia*, the officers and directors of the employer company for negligent failure to provide workmen's compensation insurance. *LaClair*, 379 Mass. 21, 22–3, 393 N.E.2d 867, 868–9 (1979). In discussing that claim, the Supreme Judicial Court wrote as follows:

> We hold only that negligence may be found, if the facts permit, where a business official disregards a duty to purchase such insurance or certify his firm as a self-insurer. It is not unusual for the employment relation to give rise to a duty to act on the part of the employer or its agents. E. g., *Newman v. Redstone*, 354 Mass. 379, 237 N.E.2d 666 (1968) (master has duty to render aid to servant who becomes hurt while in his employ). Cf. *Becker v. Interstate Properties*, 569 F.2d 1203 (3d Cir.1977) *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978). See generally M.S. Shapo, *The Duty to Act: Tort Law, Power & Public Policy* 8 (1977).

*LaClair*, 379 Mass. at 29, 393 N.E.2d at 872.

Similarly in the case of *Rae v. Air-Speed, Inc.*, the SJC reiterated

> The "well settled rule (is) that an insurance agent or broker who, with a view to compensation for his services, undertakes to procure insurance for another, and through his fault and neglect fails to do so, will be held liable for any damage resulting therefrom." Annot., 64 A.L.R.3d 398, 404, 410 (1975), and cases cited. Massachusetts law, in accordance with the general rule, clearly permits a potential insured (Air–Speed, in this case) to recover in tort for the failure of an insurance agent to perform his duty to obtain an insurance policy. See *Rayden Eng'r Corp. v. Church*, 337 Mass. 652, 660, 151 N.E.2d 57 (1958).

*Rae*, 386 Mass. 187, 192, 435 N.E.2d 628, 631 (1982).

These cases do not involve the voluntary assumption of a duty. Rather, the duty was imposed by virtue of a given relationship between the parties. This principle is incorporated in the *Restatement (Second) of Torts* § 314A (1965),

> § 314A. Special Relations Giving Rise To Duty To Aid Or Protect
>
> (1) A common carrier is under a duty to its passengers to take reasonable action
>
> > (a) to protect them against unreasonable risk of physical harm, and
> >
> > (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2) An innkeeper is under a similar duty to his guests.
>
> (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

as well as *the Restatement (Second) of Torts* § 314B (1965),

§ 314B. Duty To Protect Endangered Or Hurt Employee

(1) If a servant, while acting within the scope of his employment, comes into a position of imminent danger of serious harm and this is known to the master or to a person who has duties of management, the master is subject to liability for a failure by himself or by such person to exercise reasonable care to avert the threatened harm.

(2) If a servant is hurt and thereby becomes helpless when acting within the scope of his employment and this is known to the master or to a person having duties of management, the master is subject to liability for his negligent failure or that of such person to give first aid to the servant and to care for him until he can be cared for by others.[4]

There is no special relationship between Fieldwork and the government which would give rise to any duty between the two.

4. This notion of a duty arising by virtue of a relationship is also set forth in a tentative draft for the *Restatement (Third) of Torts:*
    § 41. Duty To Another Based On Special Relationship With The Other
    Tentative Draft No. 4:
    An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship. Special relationships imposing this duty include:
    (1) a common carrier with its passengers,

Perhaps at bottom this conclusion rests on the basic distinction between contract and tort law and the distinction between malfeasance and nonfeasance. As Judge Keeton wrote in the case of *Redgrave v. Boston Symphony Orchestra,* 557 F.Supp. 230, 237 (D.Mass., 1983):

Actions for breach of contract protect interests in having promises performed, and tort actions protect interests in freedom from harms incident to intrusions upon legally protected interests. See, e.g., W. Prosser, *Torts* 613, § 92 (4th ed.1971). The duties of conduct enforced in tort actions may or may not be based in part upon manifested promises, and the interests protected may or may not arise from relationships that involve contracts. *Id.* A contract for services may create a relationship between parties by reason of which the law recognizes a duty of reasonable care in performance that will support a tort action as well as an action for breach of contract. Massachusetts precedents establish the availability of a tort remedy in such circumstances.

When a party binds himself by contract to do a work or to perform a service, he agrees by implication to do a workmanlike job and to use reasonable and appropriate care and skill in doing it.... The count in tort states a cause of action as well as the count in

(2) an innkeeper with its guests,
(3) a business or other possessor of land that holds its premises open to the public with those who are lawfully on the premises,
(4) an employer with its employees,
(5) a school with its students,
(6) a landlord with its tenants, and
(7) a custodian with those in its custody, if the custodian is required by law to take custody or voluntarily takes custody of the other and the custodian has a superior ability to protect the other.

contract. Although the duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort.

*Abrams v. Factory Mut. Liability Ins. Co.*, 298 Mass. 141, 143–44, 10 N.E.2d 82, 83–84 (1937). *See also Attleboro Mfg. Co. v. Frankfort Marine, Accident & Plate Glass Ins. Co.*, 240 F. 573 (1st Cir.1917); *Previews, Inc. v. Everets*, 326 Mass. 333, 94 N.E.2d 267 (1950); *Damiano v. National Grange Mut. Liab. Co.*, 316 Mass. 626, 56 N.E.2d 18 (1944); *Dorr v. Massachusetts Title Ins. Co.*, 238 Mass. 490, 131 N.E. 191 (1921).

The instant case involves nonfeasance (a complete failure to perform a promise) which does not give rise to tort liability rather than malfeasance (negligence in the manner of performing what has been promised) which can result in tort liability. As one commentator has noted, "[m]uch scorn has been poured in the distinction [between nonfeasance and malfeasance], but it does draw a valid line between the complete non-performance of a promise, which in the ordinary case is a breach of contract only, and a defective performance, which may also be a matter of tort." *Prosser & Keeton on Torts*, 660, § 92 (5th ed.1984).[5]

In sum, the plaintiff has not articulated a viable theory upon which it can recover in tort on the facts of this case.[6] None of the cases upon which Fieldwork relies support its alleged cause of action. Given these circumstances, the plaintiff's claim must fail.

### B. Judicial Estoppel

#### 1. The Doctrine

■ The doctrine of judicial estoppel or "preclusion of inconsistent positions" prevents a party from asserting a position in one legal proceeding which is antithetical to a position previously taken in an earlier proceeding. *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 211–12 (1 Cir., 1987). The First Circuit recognizes that the doctrine of judicial estoppel is utilized in situations when a "litigant is 'playing fast and loose with the courts,'" and when 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors

---

**5.** It does not appear to be disputed that the alleged agreement whereby the agents of the VA would obtain the consents was a separate oral agreement apart from the written contract between the parties. The written agreement between the parties, which was in the form of a Purchase Order (*see* # 6, Exh. A), contains no provisions which in any way cover the issue of obtaining consent. Consequently, it cannot be argued that the failure to obtain consent was negligence in the manner of performing the written contract.

**6.** As indicated, the single count in Fieldwork's first amended complaint (# 16) is for "common law tort based—indemnification." In order to be entitled to indemnification on this theory, the United States has to be liable in tort. As indicated, the Court finds that the United States' liability, if any, is not in tort. The undersigned thus disagrees with Judge Wolf's analysis in his Memorandum and Order of August 28, 2003 (p. 6) in this case in which he wrote:

> Fieldwork's...theory of indemnification, that of comparative fault, is tenable at this stage. The theory allows a negligent party—the indemnitee [i.e., Fieldwork]—to recover when "the indemnitee's negligence has been insignificant in relation to that of the indemnitor." *Rathburn [v. Western Mass. Elect. Co.,]*, 395 Mass. [361] at 364, 479 N.E.2d 1383 [(1985)]. Fieldwork alleges that it only provided the facilities to the VA and did not notify the participants of the recording in reliance upon the express representation of the focus group leaders that they would seek releases. If proven, these allegations would be sufficient to require that the United States indemnify Fieldwork on a comparative fault theory. *Id.*

seeking justice.'" *Patriot Cinemas,* 834 F.2d at 212 (quoting *Scarano v. Central R. Co.,* 203 F.2d 510, 513 (3rd Cir.1953)). The underlying purpose of the doctrine "is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system." *Alternative System Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 33 (1 Cir., 2004) (citations omitted).

■ In order for judicial estoppel to be applicable, it is "widely recognized" that "at a minimum, two conditions must be satisfied." *Synopsys,* 374 F.3d at 33. Initially, the previously asserted position or estopping position, and the presently asserted position or estopped position, must be "mutually exclusive" and "clearly inconsistent." *Synopsys,* 374 F.3d at 33; *New Hampshire v. Maine,* 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Second, the party to be estopped, in this instance the United States, must "have succeeded in persuading a court to accept its prior position." *Synopsys,* 374 F.3d at 33 (citing *Lydon v. Boston Sand & Gravel, Co.,* 175 F.3d 6, 13 (1 Cir., 1999)); *Gens v. RTC,* 112 F.3d 569, 572 (1 Cir.), *cert. denied,* 522 U.S. 931, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997). Together these two conditions give the impression that either the "first court has been misled or the second court will be misled, thus raising the specter of inconsistent determinations and endangering the integrity of the judicial process." *Synopsys,* 374 F.3d at 33 (citing *New Hampshire,* 532 U.S. at 750–51, 121 S.Ct. 1808).

Another consideration weighed by courts, albeit "not a formal element of a claim of judicial estoppel," is whether the party asserting the alleged inconsistent position would gain an unfair advantage. *Synopsys,* 374 F.3d at 33. This element, however, is not a "sine qua non to the applicability of judicial estoppel" for it is the court's acceptance of the argument, "not the benefit flowing from the acceptance, that primarily implicates judicial integrity." *Synopsys,* 374 F.3d at 33.

In sum, it can generally be stated that in the situation where "'a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage'" the doctrine of judicial estoppel may be invoked. *Synopsys,* 374 F.3d at 33 (quoting *InterGen v. Grina,* 344 F.3d 134, 144 (1 Cir., 2003)).

It has also been recognized by the First Circuit as well as other circuit courts and the Supreme Court that "courts are for obvious reasons reluctant to permit estoppels against the United States."[7] *Howell v. F.D.I.C.,* 986 F.2d 569, 575 (1 Cir., 1993) (citing *Heckler v. Services of Crawford County,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)); *see also United States v. Owens,* 54 F.3d 271, 274 (6 Cir.), *cert. dism. by, Spirko v. U.S.,* 516 U.S. 983, 116 S.Ct. 492, 133 L.Ed.2d 418 (1995); *E.E.O.C. v. Exxon, Corp.,* 1 F.Supp.2d 635, 646–47 (N.D.Tex., 1998), *aff'd,* 202 F.3d 755 (5th Cir.2000). As articulated by the Supreme Court:

> When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.

7. According to the First Circuit, "[t]here are many reasons for the reluctance, including a concern for the public purse and a recognition that the government—unlike the normal actor—is an enterprise so vast and complex as to preclude perfect consistency." *Howell,* 986 F.2d at 575 (citation omitted).

*Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)(footnote omitted).

The Sixth Circuit on a rare occasion enforced the judicial estoppel doctrine against the United States, finding that there had been a "knowing assault upon the integrity of the judicial system" where the defendant had taken one position, securing judicial acquiescence, "and then knowingly attempt[ed] to persuade a different court to accept a fundamentally inconsistent position." *Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 474 (6 Cir., 1988). In a subsequent decision, *United States v. Owens,* the Sixth Circuit highlighted the reasoning in *Reynolds* that judicial estoppel, which may apply against the government where equitable estoppel may not, should still "be construed narrowly against the government for the policy reasons stated in *Heckler.*" *Owens,* 54 F.3d at 275.

Accordingly, it is appropriate to evaluate the facts of the case at bar using the elements set forth in *Patriot Cinemas* and its progeny bearing in mind that the party sought to be estopped in this case is the United States government.

### 2. Application of the Doctrine

In the Court of Federal Claims, the government took the position that that court lacked jurisdiction for two reasons: (1) that it lacked jurisdiction over the indemnification claim which was really a tort claim and (2) that it lacked jurisdiction over the alleged breach of express and implied contract claims. (Affidavit of Matthew W. Perkins # 31, Exh. 2) It is the first claim that represents the alleged estopping position at issue here.

The United States argued that the indemnification claim "sounded in tort" and thus fell outside of the jurisdiction granted to the Court of Federal Claims by the Tucker Act. (# 31, Exh. 2) It was further asserted in the moving papers that the claim was in fact a tort claim likely governed by the FTCA such that proper jurisdiction would lie in the District Court if the prerequisites of 28 U.S.C. § 2675 could be satisfied, that is, if under Massachusetts law, tort-based indemnification is available. (# 31, Exh. 2) The government elaborated on this position during oral argument, stating that this scenario is "precisely the type of situation that the Federal Tort Claims Act provides relief for, where there is a negligent omission by a government actor in the course of performing duties, the official duties of that government actor." (# 31, Exh. 4) At no time, however, did the United States discuss the viability of Fieldwork's purported tort claim under Massachusetts law. In the instant case it is the government's position that under Massachusetts law, Fieldwork had a non-delegable duty to inform the group participants that they would be recorded and therefore is not entitled to indemnification under the FTCA. (# 34)

■ These positions are not totally inconsistent and do not rise to the level necessary to invoke the doctrine of judicial estoppel. In *Patriot Cinemas* the plaintiffs argued that they would not revive their antitrust claim if the defendant's motion for a stay was denied. *See Patriot Cinemas,* 834 F.2d at 212. While giving no reasons, the Court did deny the stay. *Patriot Cinemas,* 834 F.2d at 212. Subsequently, Patriot Cinemas attempted to revive its antitrust claim and have it remanded to state court. *Patriot Cinemas,* 834 F.2d at 212. The Court pointed out that Patriot Cinemas attempted to obtain an advantage by telling the Superior Court it would take the exact opposite course of action, i.e., not reviving its antitrust claim.

*Patriot Cinemas,* 834 F.2d at 212. Had Patriot Cinemas not made this representation, the Superior Court would have granted the defendant's motion. *Patriot Cinemas,* 834 F.2d at 212.

In *Synopsys,* an action for breach of contract, the plaintiff's initial argument was that the defendant had breached a letter of understanding between two of the parties. *Synopsys,* 374 F.3d at 34. In a subsequent motion, plaintiffs argued that the breach of contract did not relate to the letter of understanding, but rather to a permanent oral agreement. *Synopsys,* 374 F.3d at 34. The First Circuit observed that this tactic was used to "dance[ ] out of the reach of Synopsys' statute of frauds defense," and "[h]aving skirted that pitfall, ASC then adopted a vastly different position." *Synopsys,* 374 F.3d at 34. The Court found "these positions [to be] totally inconsistent," and added that ASC's second argument "directly contradicts" its prior claim. *Synopsys,* 374 F.3d at 34.

In the case at bar, the government's conduct does not rise to that level of "directly contradict[ing]" its previous argument, nor is it "totally inconsistent" with its position in the Court of Federal Claims. The United States, while stating that Fieldwork's claim was a tort claim, not contract claim, did not discuss the viability of the potential tort claim or what the Massachusetts law was with respect to the availability of indemnification. To the extent that the government did discuss the indemnification claim as a tort, it merely stated that the requisite necessities for a common law negligence claim were present, thus jurisdiction would be appropriate in the District Court and not the Court of Federal Claims.

Given the deficiency in the first element, the inquiry could end here. However, an examination of the second element will make the picture even clearer.

Part two of the judicial estoppel formula is missing as well. It must be evident from a review of the record that in the other tribunal the contrary argument was relied on by the court in making its decision. *Synopsys,* 374 F.3d at 33 (citing *Lydon v. Boston Sand & Gravel, Co.,* 175 F.3d 6, 13 (1 Cir., 1999)). Again, *Patriot Cinemas* is helpful in this analysis. The Superior Court in *Patriot Cinemas,* as noted above, denied the defendant's motion for a stay because of the plaintiff's representation. *See Patriot Cinemas,* 834 F.2d at 213. The First Circuit noted that "Patriot can be said to have made a bargain with the superior court. It traded its chance for success on the antitrust claim for an increased pace in the proceedings on the remaining three counts." *See Patriot Cinemas,* 834 F.2d at 213. This is the sort of successful persuasion necessary to spur the application of judicial estoppel.

*Synopsys* also offers guidance on the second element. Recall in *Synopsys* the plaintiffs first argued to the district court, upon Synopsys' motion to dismiss, that their claim was based not on a permanent oral contract, but on a breach of the letter of understanding. *Synopsys,* 374 F.3d at 34. The first court, in its decision, noted this position in denying the defendant's motion: " 'Synopsys mistakenly assumes that ASC is claiming a breach of an oral agreement...' " The reviewing court found that "[t]here is no question but that the district court bought what ASC was selling that first time around." *Synopsys,* 374 F.3d at 34. Although the position taken by ASC only temporarily helped them get around the defendant's statute of frauds defense, the First Circuit noted that the district court had "relied on ASC's stated position to repulse Synopsys's statute of frauds assault and allow the breach of

contract count to go forward." *Synopsys,* 374 F.3d at 34.

A review of the transcript from the Court of Federal Claims reveals that the case at bar is entirely distinguishable from both *Patriot Cinemas* and *Synopsys.* (# 31, Exh. 4) Judge Smith, while apparently under the impression that there may be a viable tort claim, ultimately dismissed the case for the lack of any discernable contract claim. (# 31, Exh. 4 at 27–8) Indeed, the Judge stated that, as then pled, the case was not even transferable to the District Court because no distinguishable tort claim existed; "since a claim has not been made, there is no jurisdiction at this point in the District Court." (# 31, Exh. 4 at 29) Whether the claim was a tort was not pivotal to the Judge's determination. Rather, the Judge decided the motion to dismiss premised on his view that "there really is not a basis for finding a contract in this case." (# 31) In other words, Judge Smith would have dismissed the action for the lack of any contract claim irrespective of the government's position that the claim sounded in tort. This is to say, not only is it uncertain whether the Court of Federal Claims "bought what [the government] was selling the first time around," it is equally uncertain the United States was really "selling" that a valid tort claim existed. *Synopsys,* 374 F.3d at 34.

## V. CONCLUSION

To summarize, Fieldwork has not alleged a viable tort claim.[8] Further, the United States is not judicially estopped from arguing that Fieldwork has not stated a viable tort claim. In these circumstances, and for the reasons stated, it is ORDERED that Defendant's Motion To Dismiss First Amended Complaint (# 23)

---

8. The "law of the case" is not transgressed by this conclusion. That Judge Smith determined there was no basis for finding a con-

be, and the same hereby is, ALLOWED. Judgment shall enter for the defendant.

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT (# 41)

### I. INTRODUCTION AND HISTORY OF PERTINENT PRIOR PROCEEDINGS

On October 14, 2004, the Court issued a Memorandum and Order (# 39) allowing the United States' motion to dismiss on the ground of lack of subject matter jurisdiction. The Memorandum and Order is reported at *Fieldwork Boston, Inc. v. United States,* 344 F.Supp.2d 257, 2004 WL 2314971 (D.Mass.2004). Judgment dismissing plaintiff's amended complaint entered the same date.

On October 28, 2004, plaintiff Fieldwork Boston, Inc. ("Fieldwork") filed Plaintiff's Motion to Alter or Amend Judgment (# 41). For background to the plaintiff's motion, the reader is directed to the March 14th Memorandum and Order, 2004 WL 2314971 *1–2. The lawsuit was initiated by Fieldwork filing a one-count complaint (# 1) against defendant United States of America ("United States" or "government") on September 17, 2002. The single claim in the complaint was one for common law tort-based indemnity under the Federal Tort Claims Act ("FTCA"). In lieu of answering the complaint, on January 31, 2003 the United States filed a motion to dismiss. (# 5) Two weeks later on February 14, 2003, the plaintiff filed an opposition to the dispositive motion (# 7) and on March 31, 2003, the government filed a reply. (# 10)

---

tract on the facts as then alleged simply does not compel the conclusion that a viable tort claim is stated.

In response to an argument advanced by the government, on July 24, 2003, the District Judge to whom the case was then assigned[1] ("Judge Wolf") ordered Fieldwork to brief the issue of subject matter jurisdiction. (# 11) Thereafter the plaintiff timely submitted its supplemental memorandum addressing the jurisdictional question. (# 12) On August 28, 2003, Judge Wolf determined that Fieldwork's vicarious liability argument failed to state a claim upon which relief may be granted, but further found that the plaintiff's second theory of indemnification based upon comparative-fault was viable. Judge Wolf denied the government's motion to dismiss (# 13), but never addressed the issue of subject matter jurisdiction.[2]

On September 22, 2003, plaintiff Fieldwork filed its first amended complaint (# 16) which contained a claim in a single count for "common law tort-based indemnification." Shortly thereafter, at a Scheduling Conference before the undersigned on October 16, 2003, the parties consented to have the case reassigned to the undersigned pursuant to 28 U.S.C. § 636(c) (hereinafter, " § 636(c)"), and on October 17, 2003, Judge Wolf issued an Order (# 19) reassigning the case to the undersigned pursuant to the statute.

On November 21, 2003, the United States filed a Rule 12(b)(1) motion to dismiss the first amended complaint for lack of subject matter jurisdiction. (# 23) On December 4, 2003, Fieldwork filed its memorandum in opposition to defendant's motion to dismiss. As indicated, *supra,*

the Court allowed the motion on October 14, 2004. In so doing, the undersigned specifically indicated that I disagreed with Judge Wolf's analysis in his Memorandum and Order of August 28, 2003 denying the motion to dismiss the original complaint. *Fieldwork,* 344 F.Supp.2d at 266, 2004 WL 2314971 * 11, n. 6.

## II. DISCUSSION

■ The basis of Fieldwork's motion to alter or amend is a contention that the undersigned United States magistrate judge had no authority to alter Judge Wolf's August 28, 2003 ruling that Fieldwork's complaint was "tenable" and denial of the government's motion to dismiss even though the case had been reassigned to me pursuant to § 636(c) *after* Judge Wolf's ruling and *before* the filing of the motion to dismiss the amended complaint. In support of this contention, Fieldwork relies on a 1990 decision of then Magistrate Judge James G. Carr[3] in the case of *Taylor v. National Group of Companies, Inc.,* 765 F.Supp. 411 (N.D.Ohio, 1990).

In the *Taylor* case, the parties, pursuant to § 636(c), consented to have the case reassigned from a district judge to Magistrate Judge Carr for all further proceedings, including entry of judgment. Under the statutory scheme then in effect, any appeal from the judgment would be to the Sixth Circuit Court of Appeals. The parties had the power to elect to have any appeal go to the district court rather than the Circuit Court of Appeals but did not exercise that option.[4] *Taylor,* 765 F.Supp.

---

1. The Honorable Mark L. Wolf.

2. There is a dispute between counsel as to whether Judge Wolf separately considered the issue or not. *See* Clerk's Notes for October 16, 2003 Conference.

3. Subsequent to 1990, Magistrate Judge Carr was appointed a United States district judge.

4. The option to elect to have the appeal from the judgment entered in a consent case go to the district court rather than the circuit court of appeals was eliminated in the Judicial Improvements Bill of 1998. *See* Federal Courts Improvements Act of 1996 (Pub.L. 104–317 § 207(1)(B),(C), 110 Stat. 3847).

at 412. Before the case was reassigned to Magistrate Judge Carr, the district judge had conducted some proceedings. Specifically, the district judge had dismissed all but one of plaintiff's claims. *Taylor*, 765 F.Supp. at 413. After the case had been reassigned to Magistrate Judge Carr, the plaintiff filed a motion for reconsideration asking Magistrate Judge Carr to reconsider the district judge's ruling dismissing one of the state law claims and denying a jury trial request. *Id.* Magistrate Judge Carr found that he had no "jurisdiction to reconsider the prior rulings of the district court judge" and ruled that "[i]t is simply not the case that a magistrate's jurisdiction is, by fiat, somehow merged with that of the district judge to an extent sufficient to vest the magistrate with the authority to reconsider and set aside or alter prior decisions of the district judge." *Id.*[5]

Judge Carr supports these conclusions by the fact that § 636(c)" . . . does not authorize magistrates to reconsider prior rulings of a district judge in referred cases." *Taylor*, 765 F.Supp. at 413–4. I presume that he means that the section contains no explicit authorization. He further notes that:

Federal magistrates are thus, to some extent, subject to the authority of the district judge, but the converse is not true. Indeed, pursuant to 28 U.S.C. § 636(c)(6)[6] the district court may, "for good cause shown on its own motion . . . vacate a reference to a magistrate under this subsection." It appears that the district judge always retains

some degree of control over cases adjudicated in his court.

*Taylor*, 765 F.Supp. at 414.

Lastly, Judge Carr concludes:

The authority of a federal magistrate is limited in a variety of ways. For the foregoing reasons, I decline to review the rulings of [the district judge] denying plaintiffs' intentional infliction of emotional distress claim and plaintiffs' request for jury trial. Plaintiffs' motion in this regard is, thereby, denied.

*Taylor*, 765 F.Supp. at 414.

While I do not disagree with a number of points Judge Carr makes, I do not believe the conclusion he draws follows from the points he makes. First, I certainly agree that § 636(c) does not explicitly provide that after a case is reassigned to a magistrate judge pursuant to the parties' consent, a magistrate judge may reconsider rulings made by the district judge before the reassignment. However, that is not the end of the matter. In my opinion, the very words of the § 636(c), i.e., "[u]pon consent of the parties, a . . . magistrate judge . . . may conduct *any or all* proceedings in a jury or nonjury civil matter . . ."[7], give the magistrate judge the *implicit* power to do so. It is does not appear Congress' intent in providing that a magistrate judge has the power to conduct *all* proceedings was to exclude the authority to consider motions for reconsideration of prior rulings in the case, regardless of the identity of the judicial officer who made the prior rulings.

Second, while I agree that magistrate judges are to some extent subject to the

---

5. Judge Carr's use of the name "magistrate" rather than "magistrate judge" is explained by the fact that the official title was not changed from "magistrate" to "magistrate judge" until December 1, 1990. *See* Pub.L. 101–650, § 321. The *Taylor* opinion was issued on April 26, 1990.

6. Subsequently redesignated as 28 U.S.C. § 636(c)(4).

7. Emphasis supplied.

authority of district judges, I cannot agree that the fact that the statute provides that a district judge "for good cause" may vacate a reference made under § 636(c) should be held to exclude the power to reconsider a prior ruling of a district judge in a case after it is transferred to the magistrate judge upon the parties' consent. The conclusion which Judge Carr draws does not follow from the words of the statute upon which he relies.

Third, while I agree that the authority of a magistrate judge is limited in a number of ways, I cannot agree that this general statement, while undoubtedly true, leads to the conclusion that the authority of a magistrate judge is limited in the specific area of motions for reconsideration. Lastly, while I note that Judge Carr first finds that he has no "jurisdiction" to entertain such a motion to reconsider (*Taylor*, 765 F.Supp. at 413), his ultimate decision is that he "decline[s] to review the rulings..." of the district judge (*Id.* at 414). While I agree that in most cases a magistrate judge should, as a matter of discretion, decline to review the prior ruling of a district judge in a consent case, I see no basis for a conclusion that in an appropriate case, he or she does not have the authority to do so.

I note that there does not appear to be any case which has followed the holding in *Taylor*.[8] In fact, the Fifth Circuit has ruled that in these circumstances, a magistrate judge does have the authority to alter a prior ruling by a district judge. *Cooper v. O.A. Brookshire*, 70 F.3d 377 (5th Cir.1995).

In that case, the facts were that a district judge referred a motion to dismiss a prisoner's *pro se* § 1983 complaint to a magistrate judge for a report and recommendation. *Cooper*, 70 F.3d at 378. The motion to dismiss was based on a contention that the complaint was untimely. *Id.* The magistrate judge recommended that the motion to dismiss be granted, the prisoner objected, and the district judge sustained the objection, declined to adopt the magistrate judge's recommendation, and denied the motion to dismiss. *Id.*

> The [defendants] then moved to dismiss on the grounds that the complaint was time-barred. After both parties consented to have the magistrate judge order the entry of final judgment pursuant to 28 U.S.C. § 636(c)—and despite the prior opinion of the district judge to the contrary—that magistrate judge granted the [defendants'] motion and dismissed the complaint as untimely.

*Cooper*, 70 F.3d at 378.[9]

In a footnote, the Fifth Circuit wrote:

> For a magistrate judge to decline to follow a district judge's opinion may be unusual, but when (1) both parties consent to the jurisdiction of the magistrate judge, and (2) the district judge specifically designates the magistrate judge to conduct civil proceedings, the magistrate

**8.** One commentator has written that the rule stated in the *Taylor* case "...must be too broad" and that:

> Certain rulings by a presiding judge are inherently subject to reconsideration, such as limits on discovery. Should parties consent to proceedings before a magistrate judge after the assigned district judge has made such a ruling, the magistrate judge must have authority to modify the order. Beyond that, whenever a matter is transferred from one judicial officer to another there is the possibility that the second officer will alter the rulings of the first.

12 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure: Civil 2d* § 3072.

**9.** The Court of Appeals, even though it ruled that the magistrate judge had the authority to enter the order he did, in the end reversed the magistrate judge's ruling on the merits of his decision. *Cooper*, 70 F.3d at 381.

judge "may act in the capacity of a district court judge" and is not bound by prior opinions expressed by the district court judge. *See McGinnis v. Shalala,* 2 F.3d 548, 551 (5th Cir.1993), *cert. denied,* 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994); *see also* 28 U.S.C. § 636(c) (1988 & Supp. V 1993); *Neals v. Norwood,* 59 F.3d 530, 532 (5th Cir. 1995).

*Cooper,* 70 F.3d at 378, n. 6. *See also United States v. Johnston,* 258 F.3d 361, 369 (5 Cir., 2001).

In my view, this result best comports with the plain wording of § 636(c) and makes sense as well. For example, what if, after the district judge issued a ruling and the case was then reassigned to a magistrate judge pursuant to § 636(c), the Supreme Court handed down a decision which undercut the basis for the district judge's ruling? Can it be sensibly argued that the magistrate judge could not alter the district judge's ruling to comport with the Supreme Court's opinion? The answer is obvious.

### III. CONCLUSION AND ORDER

■ In sum, I agree with the Fifth Circuit that once the parties consent to having a case reassigned to a magistrate judge pursuant to § 636(c), the magistrate judge has all the powers which the district judge had with respect to that case, including the power to alter a prior ruling by the district judge. While the exercise of that power may (and should) be a rare occurrence, the power exists. Accordingly, it is ORDERED that Plaintiff's Motion to Alter or Amend Judgment (# 41)be and the same hereby is, DENIED.